**I.A.M. NATIONAL PENSION FUND
BENEFIT PLAN A, et al.,
Plaintiffs,**

v.

**DRAVO CORPORATION, Defendant.**

Civ. A. No. 85–0778.

United States District Court,
District of Columbia.

Oct. 23, 1985.

As Amended Oct. 31 and Dec. 9, 1985.

On Motions for Reconsideration and
to Vacate Jan. 27, 1986.

On Motion to Vacate Arbitration
Award June 20, 1986.

Robert T. Osgood, Joseph P. Martocci, Jr., Washington, D.C., for plaintiffs.

Richard R. Riese, Lee H. Pelton, Thorp, Reed & Armstrong, Washington, D.C., for defendant.

OBERDORFER, District Judge.

I.

Plaintiff, I.A.M. National Pension Fund Benefit Plan A ("the Plan"),[1] is a "multiemployer pension plan" as defined by 29 U.S.C. § 1002(37). Defendant, Dravo Corporation, is an employer which contributed to the Plan from 1969 to 1982 for the account of its employees at a fabricating division in Hastings, Nebraska. On April 27, 1982, Dravo agreed to and did sell the assets of that division to Hastings Industries, Inc. Pursuant to the assets sale agreement, Hastings Industries assumed Dravo's obligation for contributions to the Plan under 29 U.S.C. § 1384 and secured that obligation with a bond as contemplated by 29 U.S.C. § 1384(a)(1)(B). By letter dated August 11, 1982, the Plan advised Dravo that the Plan accepted documents submitted by Dravo as "permitting the avoidance of the payment of a withdrawal liabili-

---

**1.** Other plaintiffs are Eugene Glover and Lester F. Gettel, Jr. (Co-Chairmen of the Board of Trustees of the Plan) and the Board of Trustees of the I.A.M. National Pension Fund.

ty by Hastings Industries." By letter dated July 27, 1984, the Plan notified Dravo that withdrawal liability was due and assessed $339,418.00, payable in eight quarterly installments. Dravo disputed this assessment, has not paid any portion of it, and the withdrawal liability dispute is now in arbitration pursuant to 29 U.S.C. § 1401(a)(1). A hearing on that arbitration was scheduled and was conducted July 12, 1985.

The Plan brought this suit on the theory that Dravo is obligated to pay the withdrawal liability upon demand and that arbitration does not suspend that obligation. It seeks a summary judgment for the installments which would be due if Dravo had not contested its withdrawal liability, plus interest, penalties and attorney fees which are imposed by 29 U.S.C. § 1132(g) upon employers who force a plan to sue for past due contributions.

Defendant opposes the summary judgment motion on the theory that the statute does not require payment of withdrawal liability pending arbitration of a dispute as to whether an employer is liable. According to defendant, arbitration suspends the employer's withdrawal payment obligation except where the dispute in arbitration is the amount of the liability. Defendant further contends that the Plan has a burden of proving withdrawal before it can be awarded a judgment, and that there is a material issue as to whether defendant had withdrawn from the Plan when it transferred its Hastings assets.

## II.

While certain equities might support defendant's theory, its position is overwhelmed by the plain language of the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), its legislative history and several court decisions in this district and elsewhere. 29 U.S.C. § 1399(c)(2) (emphasis added) provides that:

> [w]ithdrawal liability shall be payable in accordance with the schedule set forth by the plan sponsor ... no later than 60 days after the date of the demand *notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule.*

This provision is implemented by 29 U.S.C. § 1401(d) relating to "[p]ayments by employer prior and subsequent to determination by arbitrator." It provides that:

> Payments shall be made by an employer in accordance with the determinations made under this part until the arbitrator issues a final decision with respect to the determination submitted for arbitration, with any necessary adjustments in subsequent payments for overpayments or underpayments arising out of the decision of the arbitrator with respect to the determination.

The legislative history of MPPAA indicates that one of its purposes was to reduce the incentive inherent in the original act for employers to withdraw from financially troubled plans. *See* H.R.Rep. No. 96–869, Part I, 96th Cong., 2d Sess. 60, 67, *reprinted in* 1980 U.S.Code Cong. & Ad. News 2918 at 2928 and 2935. As succinctly summarized in a Second Circuit decision:

> no matter what disputes arise between the old plan sponsor and the employer over the amount of liability, the employer is obligated to pay the withdrawal liability demanded as soon as the plan sponsor has provided notice of the payment schedule....
>
> ... Congress made the requirement that the employer promptly pay its withdrawal liability obligations crystal clear....

*T.I.M.E.–DC, Inc. v. Management-Labor Welfare & Pension Funds of Local 1730 International Longshoremen's Assoc.,* 756 F.2d 939, 946 (2d Cir.1985).

In this spirit courts have held that the employer must make assessed withdrawal payments even when the employer sought in court to contest the assessment as unconstitutional. *Trustees of the Retirement Fund of the Fur Mfg. Industry v. Lazar-Wisotzky, Inc.,* 550 F.Supp. 35, 38 (S.D.N.Y.1982), *aff'd,* 738 F.2d 419 (2d Cir.

1984). The law in this jurisdiction is similar. *See Combs v. Manor Mines, Inc.*, 5 Empl. Benefits Cases (BNA) 1475, 1477–78 (D.D.C. March 16, 1984).[2] In *Combs v. Miss.-Ala. Electrical Contractors, Inc.*, No. 85–604. slip op. at 4 (D.D.C. April 18, 1985), the law in this jurisdiction was again clarified:

> ERISA, 29 U.S.C. §§ 1399(c)(2) and 1401(d), mandate that an employer must make its withdrawal liability payments in accordance with the schedule established by the Plan pending the arbitration of any dispute over the employer's liability.

These authorities establish that the pending arbitration does not suspend Dravo's obligation to pay the withdrawal liability which has been assessed.[3] Moreover, they afford no support to Dravo's alternate argument that arbitration suspends liability when the fact of liability (as distinguished from the amount of liability) is at issue in the arbitration. Dravo is in substantially the same posture here as if there were no arbitration pending. In such a case, the Plan is entitled to summary judgment unless there is a dispute over a material issue of fact.

Dravo opposes a summary judgment on the additional ground that there is a factual dispute as to whether it has withdrawn. But that is the very issue to be resolved by the arbitrator. In fact, a summary judgment against Dravo in this court proceeding need not reach or resolve the question whether it has withdrawn. If the arbitrator decided that Dravo had no withdrawal liability or less than the amount assessed, the statute plainly provides for adjustments to reimburse Dravo for any overpayment with interest. *See T.I.M.E.-DC, Inc., supra*, 756 F.2d at 947; 29 C.F.R. § 2644.2(d) (1985). A judgment here

against Dravo merely secures for the Plan's beneficiaries the amount assessed for withdrawal liability, free from the credit risks of the employer's business. A judgment requiring such a payment, subject to reimbursement with interest (if indicated) after arbitration, is merely a judgment requiring a set aside of a disputed amount pending resolution of the dispute by arbitration, which arbitration award is itself subject to judicial review.

Dravo does not contest the constitutionality of arbitration to resolve the dispute. It merely challenges the requirement that it pay out, subject to reimbursement, the amount disputed in the arbitration. Such a "stake-holding arrangement" is well within Congress' power in the circumstances here.

Applying these principles, plaintiffs have established the material facts necessary to sustain a judgment, and they are not in dispute, namely: collective bargaining agreements obligated Dravo to make contributions to the Plan from 1969 to 1982. In 1982, Dravo ceased making contributions to the Plan after being notified that it was deemed to have withdrawn. Shortly before that date it had transferred that segment of its business which employed the personnel benefitting from the contributions to Hastings Industries and Hastings began making contributions for the benefit of those employees. The Plan has notified Dravo of its withdrawal obligation and it has disputed that liability by submitting it to arbitration. These undisputed facts require the Court to grant plaintiffs' motion for summary judgment.

As for the other relief sought by plaintiffs, 29 U.S.C. §§ 1132(g)(2), 1145, and 1451(b) in combination indicate that penalty interest, attorneys' fees and costs *shall* be awarded to the Plan when forced to sue to

---

2. *See also Combs v. Bowling & Hildebrand Trucking Co.*, No. 84–1451, slip op. at 7 (D.D.C. February 22, 1985) ("Under 29 U.S.C. § 1399(c)(2), withdrawal liability payments demanded by the Plan must be made even if the withdrawing employer seeks review or initiates arbitration of the Plan's determination of liability"); *Cf. I.A.M. National Pension Fund Benefit Plan C v. Stockton Tri Industries*, 727 F.2d 1204, 1206 n. 4 (D.C.Cir.1984) ("We express no view

with respect to the parties' varying interpretations of the statutory provisions concerning employer obligations either during the course of or in the absence of an arbitration proceeding").

3. For this reason, defendant's motion for a stay of this action pending arbitration of the withdrawal liability issue will be denied.

recover delinquent contributions. On the other hand, 29 U.S.C. §§ 1132(g)(1), 1451(e), and 1401(d) in combination indicate that the Court's award of costs, expenses and fees is *discretionary* in an action such as this one unless the "employer fails to make timely payment in accordance with [the arbitrator's] *final* decision," § 1401(d) (emphasis added). Accordingly, plaintiffs' request for penalty interest, attorneys' fees and costs under 29 U.S.C. § 1132(g)(2) will be denied without prejudice to renewal upon the effective date of the arbitrator's decision. An accompanying order will reflect this result.

## ON MOTIONS FOR RECONSIDERATION AND TO VACATE

By Memorandum dated October 23, 1985, this Court granted plaintiff's motion for summary judgment in this matter. A subsequent order dated November 6, 1985 required defendant to "deposit forthwith into the registry of the Court the amount of $259,536.34, representing $244,080.00 in scheduled withdrawal liability payments and $15,436.34 in interest thereon."[1] That summary judgment for plaintiff was based upon Dravo's responsibility under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1399(c)(2) and 1401(d) to make interim installment payments after the Plan had assessed withdrawal liability but before the arbitrator had issued a final decision with respect to that determination.

The arbitrator has now issued a decision with respect to the withdrawal liability assessment. The arbitrator's award recites that

    I. Dravo Corporation has established by a preponderance of the evidence that the

assessment of withdrawal liability against it by the I.A.M. National Pension Fund was unreasonable and clearly erroneous.

Award of Arbitrator(s) in the Matter of the Arbitration between Dravo Corporation and I.A.M. National Pension Fund, Case Number 55–621–0001–85 (November 6, 1985).

This matter is presently before the Court on defendant's Motion for Reconsideration to Alter, Amend, or Vacate Summary Judgment, which motion was filed before the arbitrator's award had been issued. The parties have also filed separate actions in this Court to respectively enforce[2] and vacate[3] the arbitrator's award. The parties apparently agree that, given the arbitrator's award, Dravo is under no obligation to make payments pending review by this Court of the arbitrator's award. Accordingly, the accompanying order will vacate the Court's order of November 6, 1985. Still in dispute, however, is the effect of the arbitrator's opinion and award (which did not address Dravo's claim that the Plan had prematurely assessed and attempted to collect withdrawal liability payments) upon the October 23, 1985 order by this Court— and the extent to which the Plan should be entitled, despite the arbitrator's award, to attorney's fees as a "prevailing party" in its action to collect interim payments pending arbitration.

Upon consideration of the current posture of this litigation, the Court concludes that it may be most expeditiously resolved if the three cases (the initial action and the subsequent actions with respect to the arbitrator's award) were consolidated and the order of October 23, 1985 (together with any petition for attorney's fees in connec-

1. The October 23, 1985 order, as supplemented by the November 6, 1985 order, was subsequently stayed by the Court's order of November 12, 1985. By its terms, the November 12 order stayed the October 23 order pending briefing by the parties on the issue of Dravo's obligation to make assessed withdrawal liability payments after the arbitrator had ruled in its favor but before such award has been reviewed by the Court pursuant to 29 U.S.C. § 1401(b)(2).

2. *Dravo Corp. v. I.A.M. National Pension Fund Benefit Plan A,* No. 85–3856 (complaint filed December 5, 1985).

3. *I.A.M. National Pension Fund, Benefit Plan A v. Dravo Corp.,* No. 85–3886 (complaint filed December 6, 1985).

tion with that action and order) were stayed pending decision on motions with respect to the arbitrator's award. Accordingly, the accompanying order will (1) vacate the order of November 6, 1985; (2) deny without prejudice defendant's present motion for reconsideration of the October 23, 1985 Memorandum; (3) stay further proceedings in Civil Action No. 85–0778; and (4) schedule a status conference at which the Court will discuss with counsel the consolidation of these cases and the scheduling of motions with respect to the arbitrator's award.

## ON MOTION TO VACATE ARBITRATION AWARD

### I.

### A.

Until May 17, 1982, Dravo Corporation ("Dravo") contributed to the I.A.M. National Pension Fund Benefit Plan A ("the Plan") on behalf of its employees.[1] On May 18, 1982, Dravo transferred assets constituting its fabricated products plant in Hastings, Nebraska, to Hastings Industries, Inc. ("Hastings"). In that transaction Hastings agreed to

continue to contribute to the Plan with respect to the covered operations of substantially the same number of contribution base units for which [Dravo] had an obligation to contribute to the [Plan].

Award, 6 EBC at 2642. On August 11, 1982, the Plan wrote Dravo that the Plan

accepts the documents you have submitted and their content as meeting the requirements of Section 4204(a)(1)(B)[2] [of the Employee Retirement Income Security Act of 1974 ("ERISA") as amended by the Multiemployers Pension Plan Amendments Act of 1980 ("MPPAA")] permitting the avoidance of the payment of withdrawal liability by Hastings Industries.

Award, 6 EBC at 2642. From May 17, 1982, until August 4, 1982, Hastings retained the same 124 hourly bargaining unit employees that Dravo had employed. On August 4, 1982; on October 6, 1982, on February 28, 1983; and on April 21, 1983, "Hastings was forced to lay off employees due to a decline in economic conditions in the industrial heating and ventilation equipment market which affected the entire heating and ventilation equipment industry." Award, 6 EBC at 2643. Thereafter, market conditions improved so that by October 29, 1984, all of the eligible employees who had been laid off had returned to work. By July 1, 1985, Hastings was employing 112 hourly bargaining unit employees, compared to the 124 employed by Dravo on the eve of the sale.

### B.

Section 4204(a)(1)(A) provides that:

[T]he purchaser has an obligation to contribute to the plan with respect to the operations for substantially the same number of contribution base units for which the seller had an obligation to contribute to the plan.

29 U.S.C. § 1384(a)(1)(A).

In October of 1982, the Fund Trustees determined that in the absence of definitive regulations promulgated by the Pension Benefit Guaranty Corporation the Plan should construe § 4204(a)(1)(A) as requiring that where, during the 12 months after a sale, a purchaser fails to contribute for at least 90 percent of the contribution base units for which the seller contributed during the 12 months before the sale, the transaction is not in compliance with the requirements for § 4204(a)(1)(A) exemption from withdrawal liability (this construction will hereinafter sometimes be referred to as the "90% rule"). At their June 1984 meeting, the Fund Trustees reviewed Hastings' contributions during the 12 months since the sale and noted that they were

---

**1.** The undisputed facts leading to this litigation have been exhaustively reviewed in *Dravo Corp. and IAM National Pension Fund,* No. 55–621–0001–85, 6 EBC 2641 (November 14, 1985) (hereinafter "Award"). Accordingly, they are here treated in more summary fashion.

**2.** *See* 29 U.S.C. § 1384(a)(1)(B).

only 68 percent of the contributions made by Dravo in the 12 months before the sale. Accordingly, the Plan determined that Dravo had become subject to withdrawal liability, totaling $339,418.00.

## II.

This matter is now before the Court on the Plan's motion to vacate the arbitration award of November 14, 1985, and Dravo's motion to enforce it. The arbitrator ruled that Dravo was not obligated to the Plan for withdrawal liability under § 4204 of ERISA, as amended, despite the fact that on May 18, 1982, Dravo had sold the assets of its plant in Hastings, Nebraska to Hastings Industries and had discontinued making contributions to the Plan. The arbitrator ruled that the Plan's determination to claim withdrawal liability from Dravo was unreasonable and clearly erroneous because the asset sale agreement between Dravo and Hastings obligated Hastings to perform all of Dravo's obligations under the Plan. Undisputed evidence established that the temporary decline in the number of bargaining unit employees which occurred a few months after the sale was caused by economic conditions in the relevant market (which conditions affected the entire industry) and not as a result of the sale. Award, 6 EBC at 2653.

Furthermore, the arbitrator found that on August 11, 1982, the Plan accepted Hastings' commitments to carry on Dravo's obligations to the Plan and approved Dravo's request to be exempted from withdrawal liability. The arbitrator specifically found that from the text and context of the Plan's letter of August 11, 1982, that the Plan approved Dravo's request for an exception under § 4204 and that the exception was not limited to § 4204(a)(1)(B) as the Plan here contends. See Award, 6 EBC at 2647.

Invoking principles of contract, laches, and estoppel, the arbitrator ruled that the Fund could not approve the exception in 1982 and repudiate that approval in 1984. In addition, the arbitrator emphasized the requirement of ERISA § 4214(b) requiring plans to give notice to all contributing employees "of any plan rules or amendments adopted...." The arbitrator treated the so-called "90% rule" invoked here by the Plan as a "plan rule" requiring notice, and found that notice to Dravo 20 months after the exemption was granted precluded the Plan's reliance upon the 90% rule in this case, particularly where, as here, if Dravo had been apprised of the 90% rule at the time of the sale, it could have taken action to protect itself from Hastings' reduction in its contributions. Award, 6 EBC at 2648–49. For these reasons, the arbitrator concluded that the August 11, 1982 letter bound the Plan to except Dravo from withdrawal liability, and precludes imposition on it "based on alleged noncompliance with Section 4204(a)(1)(A)." Id. at 2649.

## III.

■ The factual decision of the arbitrator that the sale did not cause the diminution and therefore there is no withdrawal liability is firmly supported by the language and the legislative history of § 4204(a)(1)(A). That section provides that:

> the purchaser has an obligation to contribute to the plan with respect to the operations for substantially the same number of contribution base units for which the seller had an obligation to contribute to the plan.

As explained by the Senate Labor Committee with respect to the provision that ultimately became § 4204(a)(1)(A),[3] it requires that

> the ... sale *cause* no interruption in the obligation to contribute or in contributions for substantially all the employees with respect to whom the prior employer had an obligation to contribute to the plan.
>
> ....

---

**3.** The Court concurs with the arbitrator that the change in wording between the earlier and the ultimate provision reflects no difference in the underlying intent. See Award, 6 EBC at 2650 (footnote).

The Committee intends that the phrase "substantially all of the employees" be read with a view to protecting the plan against significant harm *as a result of a particular transaction.*

Senate Labor Committee Summary and Analysis of S 1076 (April 1980) as reprinted in *BNA Washington Memorandum,* October 14, 1980; Suppl. at 83 (emphasis added).

It is noteworthy that the Labor Committee indicated its intention to distinguish between an "abusive reduction in the contribution base" (which should trigger withdrawal liability) and an "unavoidable" one "if the plan is not significantly harmed" (which should *not* result in withdrawal liability). *Id.* Addressing the issue in this context, the arbitrator found as a fact that the reduction was not "abusive" because there was a sale to a single purchaser who made a good faith attempt to continue Dravo's business, and to keep it intact. The arbitrator further found that the Hastings' decline did not cause significant harm to the fund. Moreover, even if the decline in contributions harmed the Plan significantly, that harm should not be attributed to the sale because the decline in contributions was "entirely attributable to adverse business circumstances," Award, 6 EBC at 2653, and because, the arbitrator found, "it is highly probable that if there had been no sale to Hastings, Dravo's contribution base units would have declined after April 1982 for the same reason Hastings did, and by approximately the same amount." *Id.*

The arbitrator was required to presume that Plan's determination is correct, unless Dravo showed "by a preponderance of the evidence that the determination was unreasonable or clearly erroneous." ERISA § 4221(a)(3)(A), 29 U.S.C. § 1401(a)(3)(A). The record and these findings fully justify the arbitrator's conclusion that Dravo has established by a preponderance of the evidence that the Plan's assessment of withdrawal liability was unreasonable and clearly erroneous.

Moreover, judicial review in proceedings to enforce or vacate an award in dispute like this one is governed by ERISA § 4221(c), 29 U.S.C. § 1401(c) which provides that:

there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct.

Here the clear preponderance of the evidence supports the arbitrator's finding that economic factors, not the sale, caused the discrepancy between Dravo's pre-sale contributions to the Plan and those made by Hastings after the sale. The arbitrator correctly interpreted the facts of the transaction when he ruled, as the Plan originally determined, that Hastings had effectively assumed Dravo's obligation to the Plan. Nor can the Plan rebut by a clear preponderance of evidence the arbitrator's finding that the sale did not cause the subsequent temporary decline in contributions.

It may well be that in most circumstances the 90% rule adopted by the Plan could be appropriately applied. It is not necessary to preclude its general application or draw any generalized conclusion of law about the 90% rule in order to enforce the arbitrator's award here. It is firmly grounded on the specific facts of this case and the manifest intent of Congress to leave an exemption intact where, as here, the arbitrator has fairly found the post-sale reduction in contributions was neither abusive nor significantly harmful to the Plan. Accordingly, an accompanying order will grant Dravo's motion to enforce the award and deny the Plan's motion to vacate.

\* \* \*

There remains for consideration Dravo's motion for reconsideration of the October 23, 1985 Order requiring payment of the withdrawal liability pending arbitration; Dravo's motion is based on the alleged prematurity of the Plan's withdrawal liability assessment. Irrespective of whether or not the arbitrator had authority to explore all facets of that issue, it is undisputed that Dravo and the Plan submitted that issue for resolution by him (although he ultimately found it unnecessary to address the alleged prematurity). *See* Award, 6 EBC at 2646. Accordingly, and as explored in

greater detail in the October 23, 1985 Memorandum, Dravo was obligated to make interim assessed payments pending the outcome of arbitration. In light of the recent decision of the Court of Appeals for the Third Circuit in *United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc.,* 787 F.2d 128, 134 (3d Cir.1986), *rehg. en banc* denied (April 23, 1986), the motion for reconsideration will be denied. Moreover, as the Third Circuit has ruled, the Court has no alternative but to entertain the Plan's application for reimbursement for attorneys' fees and expenses incurred in connection with their effort to recover interim payments. *See United Retail, supra,* 787 F.2d at 134–35.